John R. HOFFMAN,
Petitioner–Appellant,

v.

William D. LEEKE, Commissioner,
Respondent–Appellee.

No. 89–6785.

United States Court of Appeals,
Fourth Circuit.

Argued March 8, 1990.

Decided May 2, 1990.

As Amended May 9, 1990.

George Ellard (argued), Williams & Connolly, Washington, D.C. (Lane Heard, III, on brief), for petitioner-appellant.

Donald J. Zelenka, Chief Deputy Atty. Gen. (argued), Columbia, S.C. (T. Travis Medlock, Atty. Gen., Frank L. Valenta, Jr., Asst. Atty. Gen., on brief), for respondent-appellee.

Before ERVIN, Chief Judge, and HALL and WILKINS, Circuit Judges.

K. K. HALL, Circuit Judge:

John R. Hoffman, a South Carolina inmate, appeals the district court's denial of his petition for a writ of habeas corpus brought under 28 U.S.C. § 2254. Hoffman challenges his conviction for being an accessory before the fact to murder on the grounds that he was denied his Sixth Amendment right to effective assistance of counsel. For the reasons set forth below, we find that Hoffman's contention has

merit and we vacate the judgment and remand the case to the district court with directions to grant the writ.

## I.

Hoffman's conviction is based on his role in a murder for hire scheme originated by him to seek revenge against his wife's boyfriend. The evidence at trial showed that Roy Lowry was shot and killed by a paid killer, Johnny Hamilton, who was recruited by Hoffman's brother-in-law, George Moose, and a third person and friend of Moose, Bill Bryant, at Hoffman's instigation. Hamilton, his girlfriend Kathy Danielson, Moose, Bryant and Hoffman were all charged for their respective roles in the murder.

Moose was arrested on June 27, 1979. On July 2, 1979, Hoffman retained J.M. "Bud" Long to represent Moose. Hoffman's wife paid the $15,000 charged by Long. On July 26, 1979, after Hoffman had been questioned several times by the police about the murder and threatened with arrest, he asked Bud Long to represent him as well. Long agreed and Hoffman paid him an additional $15,000. Danielson subsequently hired Long to represent her also. On August 17, 1979, a warrant was issued for Hoffman's arrest. The following day, Long negotiated a verbal plea agreement for Moose.

When the case was called for trial in Horry County on October 15, 1979, Long represented Hoffman, Moose and Danielson. Prior to the trial, the judge held an *in camera* hearing at which he inquired of each of the defendants individually and then as a group about Long's joint representation of them. The following colloquy took place between the court and Hoffman:

COURT: All right, now, it is correct, is it not, that you are represented in this upcoming trial by Mr. J.M. "Bud" Long?

MR. HOFFMAN: Yes sir.

COURT: Are you completely satisfied with his representation of you?

MR. HOFFMAN: Yes sir.

COURT: Now, are you aware of the particular charges that are placed against you, the charge of accessory be-fore the fact of murder ... Are you aware that those are the charges against you?

MR. HOFFMAN: Yes sir.

COURT: All right now, are you aware of the fact that Mr. Long represents, as well as you, two other Defendants in this case?

MR. HOFFMAN: Yes sir, I am.

COURT: Now, in the event that you should go to trial on the charges against you, are you aware of the possibility that while you would not be compelled to testify, that you may be called to testify, and you may voluntarily testify in this case?

MR. HOFFMAN: Yes sir.

COURT: And that if you did testify, that your testimony could affect other Defendants represented by Mr. Long?

MR. HOFFMAN: Yes sir.

COURT: Are you aware of the possibility that the other two Defendants represented by Mr. Long may be called to testify, and may testify?

MR. HOFFMAN: Yes sir.

COURT: And that the testimony of each one of these, should they testify, might affect you?

MR. HOFFMAN: Yes sir, I'm aware of it.

. . . . .

COURT: In view of these matters which I have asked you about, do you feel that Mr. Long can fully represent you?

MR. HOFFMAN: Yes sir, I do.

COURT: Now, Mr. Hoffman, are you aware of your absolute Constitutional Right to competent, independent legal counsel?

MR. HOFFMAN: Yes sir, I am.

COURT: Do you feel that you have such counsel in Mr. Long?

MR. HOFFMAN: Yes sir, I do.

COURT: Has he fully disclosed to you the fact that he represents the other two Defendants?

MR. HOFFMAN: Yes sir, he has.

. . . . .

COURT: All right, now understanding all these matters that we have discussed, are you completely satisfied for Mr. J.M. Long to continue his representation of you?

MR. HOFFMAN: Yes sir, I am.

COURT: Do you have any objection to his representation of the other two Defendants?

MR. HOFFMAN: None whatsoever, sir.

Following similar colloquies with each defendant, the court inquired of all three as a group whether they were satisfied with Long's representation and each answered affirmatively. Long then stated to the court that he saw no possibility of a conflict of interest and each of the defendants agreed. The trial began but ended in a mistrial shortly after jury selection.

Venue was subsequently changed to Georgetown County and Long hired a local attorney, William Doar, as co-counsel. On November 26, 1979, before the start of the second trial, the judge held an *in camera* hearing and asked each defendant whether they recalled the questions posed at the first trial and whether they wished to continue with Long as their attorney. Each answered affirmatively. On the following day, the court accepted plea agreements from Moose and Danielson in which each agreed to testify for the state at Hoffman's trial.[1]

Moose was the key prosecution witness against Hoffman. He testified that he hired Johnny Hamilton to kill Roy Lowry because "somebody had raped" his sister, Hoffman's wife. He said he acted at Hoffman's instigation. Moose claimed that Hoffman had proposed the idea and later in a telephone conversation encouraged him to continue the search for a trigger man. William Doar conducted the cross-examination of Moose. Hoffman took the stand in his own behalf and testified that in late November 1978, when he told Moose about Roy Lowry and Hoffman's wife, Moose had first offered to kill Lowry himself. Hoff-

man testified that after initially encouraging Moose to look for someone to kill Lowry, in late February or early March of 1979, he told Moose the plan was off and took back the money he had given Moose to pay a killer. Hoffman testified that he learned of the murder sometime in May 1979, when Moose demanded payment for the paid killer, claiming that Moose and Hoffman would be the next victims if payment were not made. Hoffman denied the telephone conversation with Moose in which he allegedly told Moose to keep looking for a killer. He did, however, testify that he was drinking heavily during this period. Throughout the trial, the prosecutor continually and repeatedly made reference to Long's representation of Moose and Danielson, as well as Hoffman. A jury found Hoffman guilty as an accessory before the fact to murder and he was sentenced to life in prison.

Following his conviction, Hoffman moved for a new trial based upon, *inter alia,* ineffective assistance of counsel arising out of Long's conflict of interest in representing the multiple defendants. The trial judge denied the motion. The South Carolina Supreme Court affirmed Hoffman's conviction. *State v. Hoffman,* Mem.Op. 83–MO–57 (March 30, 1983). Hoffman exhausted his state remedies and on April 4, 1986, filed a petition for writ of habeas corpus in federal district court. The case was referred to a magistrate who, following an evidentiary hearing, found that Hoffman freely, voluntarily and intelligently waived his right to conflict-free counsel and recommended that the application for habeas corpus relief be denied. The district court adopted the magistrate's report and recommendation and dismissed the petition. Hoffman appeals.

## II.

The following evidence was adduced at the hearing held before the magistrate. William Doar testified that he was retained by Long when Hoffman's trial was trans-

---

1. Moose was originally indicted for conspiracy to commit murder and accessory after the fact to murder. When the plea agreement was presented to the court at the beginning of Hoff-

man's trial, the prosecutor informed the court that Moose would have been charged with something greater except that the state had to have him as a witness against Hoffman.

ferred from Horry County to Georgetown County. His function was primarily to assist in selection of the jury and jury argument. Doar testified that Long remained the principal attorney for Hoffman and that he, Doar, did not participate in the preparation of the case, but did participate in conferences during trial. He did not recall the conference just prior to trial that was held in chambers between the judge and the three defendants concerning a possible conflict of interest. Nor did he recall any other discussions concerning a possible conflict of interest. Doar could not recall his cross-examination of Moose, did not know why he conducted the cross-examination, did not recall preparing for the cross-examination and did not recall any conferences with Long or Hoffman concerning the cross-examination of Moose. Doar considered himself to be in the case to add "local flavor."

George Moose testified that his sister, Hoffman's wife, paid Long $15,000 to represent him and that he selected Long because everyone in the Horry County jail recommended him. He entered into a plea bargain agreeing to testify for the state in return for a reduced sentence. He could have received the death penalty if convicted of the original charges, so he thought the plea bargain under which he was to receive a twenty-year sentence was a good one. The plea bargain required Moose to give a statement to the police. He did so on August 21, 1979, on Long's advice. The statement implicated Hoffman.

Moose also testified that he was never told by Long that he would be a witness against Hoffman and did not recall telling Hoffman he would be a witness against him. Nor did he give Hoffman a copy of his statement. He followed Long's initial instructions, which were not to discuss the case with anyone, including his codefendants. Moose testified that he recalled no meetings concerning the propriety of joint representation except the first meeting in the judge's office in Horry County. Before that meeting, Long told all three defendants to tell the judge that it was all right for Long to represent the three of them. They did. Moose also testified that, except

for the jury selection process, the only dealings he had with Doar were during his cross-examination. Doar did not discuss the case or Moose's testimony with him prior to the actual cross-examination.

John Hoffman testified that he retained Long to represent him after the police threatened him with arrest and that he knew Long was also representing Moose because he had helped arrange that representation. Hoffman also testified that Long asked him and Moose to come to his office prior to the date of Hoffman's arrest, and without explaining what he meant by conflict of interest, Long asked if either of them saw a conflict in his representing both of them. Both Moose and Hoffman told him that they saw no conflict. Hoffman testified that he saw no problem with the joint representation because he thought that both he and Moose would testify to substantially the same facts and that the testimony would be exculpatory.

At all times prior to trial, Hoffman followed Long's instructions not to talk with anyone about the case. Hoffman testified that he did not know that Moose was going to appear as a witness for the state and implicate him in Lowry's murder until Moose took the stand. He also testified that when he met with the judge in chambers prior to the first trial, he was under the impression that the discussion was simply a formality, and he did not understand that any of the codefendants would testify for the state. Had he known Moose was going to testify, he stated he would not have told the judge it was all right for Long to represent him. Hoffman also testified that no one told him the prosecutor could argue the joint representation issue to the jury. In conclusion, Hoffman testified that he paid Long $15,000 to represent him, that his wife paid Long $15,000 to represent Moose, and that he paid Doar $5,000 to be present for jury selection and trial.

The final witness to testify was J.M. "Bud" Long. Long testified that he was hired by Hoffman to represent Moose and was later asked to represent Hoffman. Before he accepted Hoffman as a client, Long

spoke to both Hoffman and Moose about a possible conflict of interest. Each told him that he had nothing to do with the murder of Roy Lowry, and that there was no conflict in his representing both of them. Long testified that when a plea bargain was offered to Moose, Long discussed it with Hoffman, and disclosed that it required Moose to give a statement to the police. According to Long, Hoffman told him to tell Moose to testify truthfully, and Hoffman also made arrangements to turn himself in to the police and give a statement of his own.

Long testified that Hoffman and Moose were advised of the possibility of a conflict of interest by the judge, that he advised both to tell the judge exactly what the situation was, and that if they wanted another lawyer, it was all right. Long saw no conflict between Moose and Hoffman. He thought it important that Hoffman had given a statement that was factually similar to that of Moose.

Long also testified that he hired Doar to help with jury selection because of his reputation in the Georgetown community. He decided that Doar should cross-examine Moose because Moose was not considered a hostile witness and Long thought his testimony would be favorable to Hoffman. Long felt that if he had cross-examined Moose, favorable testimony would have been "watered down" because he also represented Moose. Long indicated that he never felt an inability to competently represent Hoffman or Moose because of any conflict of interest.

Long testified that the defense he had planned for Hoffman was that the victim "needed killing." Long thought he could elicit sympathy from the jury by presenting evidence that the victim tried to make pornographic films of Hoffman's daughter and would not leave Hoffman's wife alone. Long testified that he saw no conflict of interest until around the time the second trial started. It was then that Hoffman said that after he got the money back from Moose and told Moose that the plan was off, he did not speak to Moose again until after he learned that Lowry had been killed. Long also testified that he did not feel that any conflict affected his representation of Hoffman; he would have done nothing differently at trial if he had not been representing Moose.

On cross-examination, Long indicated that his goal for Hoffman was to avoid the death penalty or a life sentence, which carried a mandatory twenty-year term for a murder conviction. Long agreed that Moose's statement provided a critical link to Hoffman, and that without it Hoffman's case would never have gone to the jury.

### III.

■ On appeal, Hoffman contends that he was denied the right to effective assistance of counsel because Long was laboring under a conflict of interest. We agree. The Sixth Amendment guarantees a defendant in a criminal case the effective assistance of competent counsel. *Powell v. Alabama*, 287 U.S. 45, 58, 53 S.Ct. 55, 60, 77 L.Ed. 158 (1932). Permitting a single attorney to engage in the joint representation of codefendants is not a *per se* violation of the Sixth Amendment right to effective assistance of counsel. *Holloway v. Arkansas*, 435 U.S. 475, 482, 98 S.Ct. 1173, 1177, 55 L.Ed.2d 426 (1978). However, it is well settled that the Sixth Amendment right to assistance of counsel is breached where one lawyer is required to represent two defendants despite the defendants' conflicting interests. *Glasser v. United States*, 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942). Stated another way, the Sixth Amendment right to counsel includes the right to effective assistance free of conflicts of interest, and in the case of a single attorney representing multiple defendants, free from conflicting interests among each of the defendants. *Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981); *United States v. Ramsey*, 661 F.2d 1013, 1017 (4th Cir. 1981), *cert. denied* 455 U.S. 1005, 102 S.Ct. 1642, 71 L.Ed.2d 874 (1982). This principle applies to retained counsel as well as to appointed counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980). Whenever a defendant

is able to demonstrate that his lawyer " 'actively pursued conflicting interests' and 'that [an] actual conflict of interest adversely affected his lawyer's performance,' " constitutional error has occurred, as prejudice is inherent in the conflict. *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984), *citing Cuyler v. Sullivan,* 446 U.S. at 350, 100 S.Ct. at 1719. *See also Vance v. State,* 275 S.C. 162, 163, 268 S.E.2d 275, 276 (1980).

■ Thus, at the outset we must determine whether there was an actual conflict of interest and, if so, whether that conflict adversely affected Long's representation of Hoffman. A thorough review of the record in this case leads us to the inescapable and unavoidable conclusion that such a conflict existed and that it did adversely affect Long's representation. The state argues that there was no actual conflict of interest because after Moose pleaded guilty to conspiracy to murder, the only defense available to Hoffman was the defense of withdrawal. Whether Moose was represented by Long or another attorney, Hoffman would have been confronted by Moose's testimony at his trial. The state also argues that the joint representation gave Hoffman an advantage, because he had access to Moose that he might not have otherwise had, and this access aided him in the preparation of his defense. Finally, the state argues that whether Long's performance at trial was adversely affected by a conflict of interest is moot because Hoffman was also represented by other independent counsel, William Doar.

These arguments are without merit because they ignore the unrefuted facts present here. Long was representing both Moose and Hoffman in August 1979. The day after a warrant was issued for Hoffman's arrest, Long negotiated a plea agreement for Moose in which Moose agreed to testify for the state and give a statement to the police. Pursuant to the plea agreement, and on Long's advice, Moose gave the statement in which he implicated Hoffman. The importance of Moose's statement in Hoffman's prosecution was admit-ted by Long in his testimony before the magistrate, when he testified that in his opinion Hoffman's case would not have gone to the jury without it. The prosecutor also acknowledged the importance of this statement when he presented Moose's plea to the court just prior to the start of the second trial:

> [George Moose] made a statement in the nature of a confession after plea negotiations had been entered into whereby he would give his testimony. And he then confessed himself and [that] led to the final link in the chain of events that [led] to John R. Hoffman.

Throughout the trial and collateral attack proceedings, Long maintained that he saw no conflict of interest because he thought Moose and Hoffman would testify to substantially the same facts. It is difficult for us to understand, and indeed we do not, how advising one client to give a statement and testify to the essential elements of a crime allegedly committed by a second client is not a conflict of interest. From the outset of Long's representation of Hoffman, a conflict was patent. While representing Hoffman, Long advised Moose to give a statement which implicated Hoffman, and to agree to testify against Hoffman as part of a plea agreement. Hoffman was in the unacceptable position of having his own attorney help the state procure a witness against him. There was at this point an actual conflict of interest, and the state's argument that there was not is without merit.

The question now becomes whether Long's actual conflict of interest adversely affected his performance. Again, the circumstances here require that this question be answered in the affirmative. The fact that Long negotiated a plea bargain for Moose that required Moose to implicate Hoffman coupled with the fact that Long did not tell Hoffman what Moose's testimony would be shows that Long's conflict adversely affected his representation of Hoffman. Further adverse effects from the conflict occurred when Long's representation of Moose prevented him from cross-examining Moose and thus from at-

tacking what amounted to the state's entire case against Hoffman. To cross-examine Moose effectively, Long would have had to question his own client's truthfulness. This he could not do.

Finally, Long's performance was adversely affected by the prosecutor's repeated references, throughout the trial, to Long's representation of not only Hoffman, but also Moose and Danielson.[2] Long testified that prior to trial he hoped the prosecutor would not make this line of argument, but thought that there was a possibility that he would. Even so, Long did not warn Hoffman of that possibility.

■ The state argues that William Doar's participation in the trial cured any possible adverse consequences to Hoffman from Long's conflict of interest. In effect, the state asks us to find that Long's actual conflict of interest was harmless error. We cannot.

In *Cuyler v. Sullivan*, 446 U.S., at 345–350 [100 S.Ct. at 1716–1719], the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, see, *e.g.*, Fed.Rule Crim.Proc. 44(c), it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest.

*Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067.

The *Strickland* Court intimates that there may be some peripheral category of extremely unusual cases in which an actual conflict of interest adversely affecting counsel's performance may not result in presumed prejudice. Whatever the scope of that category may be, it does not include this case. Long cross-examined fourteen of the seventeen state witnesses. Doar cross-examined three, including, *because of Long's conflict of interest*, the state's most critical witness. The magistrate below found, in accordance with the testimony of both Long and Doar, that Long prepared the case without Doar's assistance and remained Hoffman's principal attorney throughout the trial.[3] Therefore, regardless of the effectiveness of Doar's efforts at trial, upon which we need not pass judgment, those efforts could not have overcome the presumed prejudice arising from Long's actual conflict of interest.

2. On direct examination the prosecutor asked Moose the following questions:

Q. Who was your lawyer at the time that deal or concession was made for exchange for your testimony in solving the case?
A. Mr. Long has been my attorney since I have been down here.
Q. And Mr. Long is still your attorney?
A. Yes, sir.

The prosecutor dwelled on the joint representation in his closing argument:

I am going to hit the highlights with you.... No question but that Moose, his own brother-in-law, who is, by the way, represented by Mr. Long, too, you will remember. He represented Moose too. That was his client on the stand, Moose, as well as his client, John Hoffman. What did Moose tell you when he got on the stand? He ... said Johnny told him, "I have got a man I need to get rid of." And he started making arrangements right then.

. . . . .

[N]ow what did Moose say about that ... "I ... told him I would keep looking." That's

his brother-in-law, and he is Bud Long's client and ... his own brother-in-law and Bud Long's own client said that he told him he would keep looking, which he did.

3. Thus, this case does not present a situation where a *defendant*, represented by co-counsel, receives effective assistance from his conflict-free counsel at all critical stages of the criminal process, while his conflicted attorney plays a subsidiary role. We suspect that some such instances may fall within the class of cases discussed by the Supreme Court in *Strickland*, where, notwithstanding an actual conflict of interest adversely affecting the attorney's performance, prejudice will not be presumed. How effective the conflict-free counsel must be and how minor the conflicted counsel's participation must be to overcome the presumption of prejudice are questions that must await another day.

## IV.

█ The state argues that, notwithstanding Long's actual conflict of interest, Hoffman waived his right to conflict-free assistance of counsel. Both the state and Hoffman posit that the right to so waive conflicts of interest is absolute, and that this court need only review the district court's finding that Hoffman made a knowing and intelligent waiver. Neither cites or discusses *Wheat v. United States,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), which establishes that the Sixth Amendment right to counsel of choice is not inviolable, and that courts have broad discretion to prohibit multiple representation where it would undermine confidence in the integrity of the criminal justice system or force the court to countenance unethical attorney conduct. As Chief Justice Rehnquist explained, "... the aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Id.,* 108 S.Ct. at 1697. Not even the proffer of admittedly valid waivers of conflict-free counsel can restrict a trial court's power to insist on separate representation.

> Petitioner insists that the provision of waivers by all affected defendants cures any problems created by the multiple representation. But no such flat rule can be deduced from the Sixth Amendment presumption in favor of counsel of choice. Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.

*Id.*

Both of the Supreme Court's concerns are manifest in this case. As we discuss *infra,* both the applicable South Carolina and ABA ethical rules appear to prohibit Mr. Long's conduct in this case. Moreover, we believe that a member of the public would be shocked to observe a criminal trial in which the same attorney represented both the defendant and the state's star witness, in which the attorney had cut the deal that made that witness available to the state, and in which the prosecutor pointed out the defense attorney's untenable position at every opportunity.

We recognize that a trial court has "broad latitude" to permit or prohibit multiple representation. *Id.* at 1699. Nonetheless, we find that permitting multiple representation in a case of this type exceeds that latitude.

█ In any event, we do not agree with the state that the record supports a finding that Hoffman proffered a valid waiver of his right to loyal counsel.

█ The test to be applied in determining whether a fundamental right, such as the right to effective counsel, has been waived is well-settled. The state can establish a waiver only by proving an intentional relinquishment or abandonment of the right. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). To be valid, a waiver must not only be voluntary, it must be done knowingly and intelligently. *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1468, 25 L.Ed.2d 747 (1970). Whether there has been a waiver depends on the particular facts of each case and the court must make as thorough and long an inquiry as necessary to determine whether the accused is voluntarily, knowingly and intelligently waiving his right. *Von Moltke v. Gillies,* 332 U.S. 708, 723–24, 68 S.Ct. 316, 323–24, 92 L.Ed. 309 (1948).[4]

---

4. Fed.R.Crim.P. 44(c), effective December 1, 1980, imposes the following duty on trial judges:

> Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

We realize that the state trial judge held an *in camera* hearing on the conflict of interest issue before the first trial in October of 1979 and that Hoffman purported to waive his right to independent counsel at that hearing. This waiver was not intelligent, however, because Hoffman could not waive what he did not know. No one had explained to any of the defendants exactly what is meant by a conflict of interest. Hoffman testified that he was not aware that Moose was going to testify against him and implicate him in the murder, and, according to Hoffman, Long never told him that he had advised Moose to testify. Moose's testimony substantiated that of Hoffman. Although Long testified that he did tell Hoffman that Moose had signed a plea agreement and was going to be a state's witness, the evidence is unrefuted that Long did not explain what he meant by a conflict of interest. If Hoffman did not understand how Moose's testimony would affect him in light of Long's joint representation, then he could not make an intelligent waiver. Indeed, in response to the court's inquiry at the *in camera* pretrial conference, Long stated, "I can see no possibility of a conflict with any of them, as I understand it." If Long was suffering from such myopia, we cannot insist on greater appreciation of the risk of conflict on the part of a layman whom Long advised.

Not only did Hoffman not make an intelligent waiver before trial, but he also certainly did not make a waiver during trial when Moose took the witness stand. It is not clear from the record whether the trial judge was aware of Moose's and Danielson's plea agreements when he held the first *in camera* hearing. However, he clearly became aware of the agreements at the start of the second trial, and at that point his obligation to insure a fair trial became apparent. When it became obvious that Long had negotiated a plea bargain for Moose that required him to incriminate Hoffman, the judge had a duty to conduct further inquiry and secure a further waiver if Hoffman wished to make one. If Moose's agreement to testify against Hoffman did not come out during the court's acceptance of the pleas, the judge became aware of it when the state called Moose to the witness stand. At that time, when the particular nature of the conflict came into sharp focus, further inquiry should have been made. Thus, even if Hoffman waived his right to conflict-free counsel at the hearing held in October 1979 and possibly again at the beginning of the second trial in November, he did not waive that right when he became aware that Moose was going to testify against him. A defendant cannot knowingly and intelligently waive what he does not know.

We feel compelled at this juncture to point out that serious ethical problems can arise from the joint representation of multiple codefendants. *See* South Carolina Disciplinary Rule DR 5–105.[5] The American

---

5. South Carolina Disciplinary Rule DR 5–105 provides:

> *Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.*
>
> (A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5–105(C).
>
> (B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C).

> (C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.
>
> (D) If a lawyer is required to decline employment or to withdraw from employment under DR 5–105, no partner or associate of his or his firm may accept or continue such employment.
>
> *See also* Canon 6 of the American Bar Association's Canons of Professional Ethics ("Adverse Influences and Conflicting Interests"); and American Bar Association, Code of Professional Responsibility, Canon 5 ("A Lawyer Should Exercise Independent Professional Judgement on Behalf of a Client").

Bar Association has also addressed the problems of joint representation. *See* ABA Standards for Criminal Justice Relating To The Defense Function, § 4–3.5(b).[6] Quite aside from the independent force of these ethical considerations, they are relevant to the trial court's duty to prohibit multiple representation where it undermines the integrity of our system of justice.

"[W]hen a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's chosen counsel to conform with the ABA Code of Professional Responsibility, the court should not be required to tolerate an inadequate representation of a defendant. Such representation not only constitutes a breach of professional ethics and invites disrespect for the integrity of the court, but it is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court and the subtle problems implicating the defendant's comprehension of the waiver."

*Wheat,* 108 S.Ct. at 1698–99, *quoting United States v. Dolan,* 570 F.2d 1177, 1184 (3d Cir.1978).

### V.

We find that Long had an actual conflict of interest that adversely affected his performance as Hoffman's attorney. Hoffman was therefore denied his Sixth Amendment right to effective assistance of counsel. We further find that Hoffman did not knowingly and intelligently waive his right to loyal counsel, and that the court should have exercised its power to prohibit the multiple representation even if Hoffman had proffered a valid waiver. Accordingly, the judgment of the district court is reversed and the case remanded with instructions to issue the writ of habeas corpus. Unless the state elects to retry the defendant within a reasonable time, he should be released.

REVERSED AND REMANDED WITH INSTRUCTIONS.

---

**6.** ABA Standards for Criminal Justice Relating To The Defense Function, § 4–3.5(b) provides:
[A] lawyer or lawyers who are associated in practice should not undertake to defend more than one defendant in the same criminal case if the duty to one of the defendants may conflict with the duty to another. The potential for conflict of interest in representing multiple defendants is so grave that ordinarily a lawyer should decline to act for more than one of several codefendants except in unusual situations when, after careful investigation, it is clear that:
(i) no conflict is likely to develop;
(ii) the several defendants give an informed consent to such multiple representation; and
(iii) the consent of the defendants is made a matter of judicial record. In determining the presence of consent by the defendants, the trial judge should make appropriate inquiries respecting actual or potential conflicts of interest of counsel and whether the defendants fully comprehend the difficulties that an attorney sometimes encounters in defending multiple clients.
In some instances, accepting or continuing employment by more than one defendant in the same criminal case is unprofessional conduct.