Paul J. KRATSAS, Petitioner,

v.

UNITED STATES of America, Respondent.

Civil No. HNM–95–2007.
Crim. No. H–92–0208.

United States District Court,
D. Maryland.

June 27, 2000.

**MEMORANDUM**

MALETZ, Senior Judge.[1]

On March 18, 1993, the petitioner, Paul Kratsas, was convicted by a jury of conspiracy to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. § 846, and laundering proceeds of unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(B)(I). Given petitioner's two prior convictions for felony drug offenses, the court imposed a mandatory life sentence as to Count I pursuant to 21 U.S.C. § 841(b)(1)(A), and a seventy month concurrent sentence as to Count II. Kratsas appealed arguing that the statute requiring a mandatory life sentence was unconstitutional. The Fourth Circuit disagreed and affirmed the judgment of the district court. *See United States v. Kratsas,* 45 F.3d 63 (4th Cir.1995). Presently before this court is petitioner's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (1994), *amended by* Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214.

In support of his petition, Kratsas claims that he was denied effective assistance of counsel alleging: 1) that his attorney failed to advise him that he was subject to a mandatory life sentence; 2) that a conflict of interest existed between his attorney and the government's star witness; and 3) that his attorney failed to challenge two prior convictions that formed the basis of his mandatory life sentence. Counsel was appointed to represent petitioner, and on October 12 and 27, 1999 the court held an evidentiary hearing on this matter.

*I. Background*

Once indicted on federal charges, Kratsas hired Louis Martucci to represent him. Mr. Martucci negotiated a plea agreement with the government that involved not only the federal charges, but some pending state charges as well. The agreement provided that Kratsas would plead guilty to

Beth M. Farber, Assistant Federal Public Defender, Baltimore, MD, for Petitioner.

Lynne A. Battaglia, U.S. Attorney, Barbara S. Skalla, Asst. U.S. Attorney, Greenbelt, MD, for Respondent.

1. Of the United States Court of International Trade, sitting by designation.

both counts of the Superseding Indictment. Further, the agreement set forth the maximum sentences for each offense.[2] However, on August 3, 1992 Kratsas appeared before United States District Court Judge Alexander Harvey II, and advised the court that he would not be entering a guilty plea. Further, he informed the court that he would be relieving Mr. Martucci of his services and retaining a new attorney, Jack Rubin.

Mr. Rubin had previously represented one of Kratsas's co-conspirators, George Bonnett, in another matter, and as part of Bonnett's agreement with the government in that case, he had agreed to testify against Kratsas. Concerned about this potential conflict of interest, the government filed a motion to remove Mr. Rubin. Judge Harvey held a hearing, and thereafter concluded that Mr. Rubin was not laboring under an actual conflict of interest. In support of his denial of the government's motion, Judge Harvey noted: 1) that Mr. Rubin no longer represented Bonnett; 2) that Kratsas's defense did not involved shifting the blame to Bonnett; 3) that Mr. Rubin was not in possession of confidences that could be used to impeach Bonnett; 4) that Mr. Rubin represented Bonnett for a very short period of time in preliminary proceedings; 5) that Mr. Rubin took no part in negotiating the plea agreement under which Bonnett was to testify; and 6) that Kratsas knowingly and intelligently agreed to be represented by Mr. Rubin.

After Mr. Rubin began his representation of Kratsas, he persuaded the government to reinstate the plea agreement that Kratsas had previously rejected. Again, Kratsas rejected the plea, choosing instead to proceed to trial. At the conclusion of the trial, Kratsas was convicted of both counts, and was ultimately sentenced to life in prison.

**2.** The maximum term of imprisonment for Count One (conspiracy to possess with intent to distribute) was set forth as life, with a mandatory minimum of ten years. At the time of the agreement, these minimum and

## II. *Ineffective Assistance Standard*

Kratsas's contention, that he received ineffective assistance of counsel, may be properly raised for the first time in a post-conviction motion. *See e.g., United States v. DeFusco*, 949 F.2d 114, 120–21 (4th Cir.1991); *United States v. Breckenridge*, 93 F.3d 132, 134 n. 1 (4th Cir.1996). However, in order to establish a claim of ineffective assistance, the petitioner's claim must pass the two-prong test enunciated by the Supreme Court. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Petitioner must prove both: 1) that his attorney's conduct fell below an objective standard of reasonableness; and 2) that such deficient performance caused him prejudice. *See Id.* at 687–91, 104 S.Ct. 2052. Prejudice is defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 694, 104 S.Ct. 2052.

According to *Strickland*, there exists a strong presumption that counsel's conduct was within a wide range of reasonably professional conduct, and courts must be highly deferential in scrutinizing counsel's performance. *See Id.* at 688–89, 104 S.Ct. 2052. Furthermore, a determination need not be made concerning the attorney's performance if it is clear that no prejudice would have resulted even if the attorney had been deficient. *See Id.* at 697, 104 S.Ct. 2052. Applying this test to the claims presented, the court finds that Kratsas fails to demonstrate that he received ineffective assistance.

## III. *Mandatory Life Sentence*

First, petitioner claims that his trial counsel was ineffective for failing to advise him that if convicted he would be sen-

maximum sentences were correct; however, the government subsequently filed a notice of enhancement under 21 U.S.C. § 851 which triggered the mandatory life sentence under 21 U.S.C. § 841(b)(1)(A)(viii).

tenced to a mandatory term of life imprisonment. He alleges that neither of his two attorneys ever advised him that he faced a mandatory life sentence. Furthermore, he maintains that had he known that he was subject to such a sentence, he would have accepted the government's plea offer.

▪ The right to effective assistance of counsel attaches to the plea bargaining phase of a criminal trial. *See e.g., United States ex. rel. Caruso v. Zelinsky*, 689 F.2d 435, 438 (3rd Cir.1982); *Johnson v. Duckworth*, 793 F.2d 898, 900–02 (7th Cir.1986); *United States v. Gordon*, 156 F.3d 376, 379–80 (2nd Cir.1998). Moreover, several circuits have held that an attorney's inaccurate assessment of a defendant's potential sentence after trial constitutes ineffective assistance if the defendant can demonstrate that he would have accepted the plea offer if he were properly informed. *See United States v. Day*, 969 F.2d 39, 43 (3rd Cir.) (insufficient advice from counsel that undermines a defendant's ability to make an intelligent decision about a plea offer states a Sixth Amendment claim); *Nagi v. United States*, 90 F.3d 130, 135–36 (6th Cir.1996) (to succeed on a claim of ineffective assistance regarding a plea offer, petitioner must demonstrate that counsel's deficient performance caused him to reject plea); *United States v. Gordon*, 156 F.3d 376 (2nd Cir.1998) (affirmed district court's decision to vacate conviction based on misadvise during plea stage when defendant was advised he faced 92 – 115 month sentence and actually faced a 262 – 327 month sentence). Thus, to prevail on this claim, Kratsas must demonstrate that his counsel was deficient in advising him about his potential sentence exposure, and that such deficiency caused him to reject the plea offer.

At the evidentiary hearing the defendant, Mr. Martucci, Mr. Rubin, and Jan Miller, an Assistant United States Attorney, testified. As the defendant notes in his post-hearing memorandum, Mr. Martucci's memory of the events surrounding Kratsas's case is questionable.

When asked about the petitioner's physical condition at the time of his first meeting with him, Mr. Martucci testified:

> As far as I know, he seemed to be in good physical condition. He seemed to be of sound mind. He understood everything that we discussed. I didn't see anything unusual about his appearance or demeanor.

E.H. I p. 58.[3] However, Kratsas later testified that he was shot in the face on May 7, 1992 and appeared in federal court for his arraignment on June 9, 1992. E.H. I p. 113–115. He further testified that he met with Mr. Martucci prior to the arraignment and was still under doctor's care after the arraignment. *See Id.* In fact, he testified that his jaw was still wired shut when appearing in court on June 9th. *See Id.* This portion of Kratsas's testimony was unimpeached, and the docket sheet corroborates that Kratsas did appear in court on June 9, 1992 and that Mr. Martucci entered his appearance on June 4, 1992.

Given this testimony, the court questions whether Mr. Martucci has an independent recollection of the events about which he testified. It is rather unlikely that he would forget that his client had been shot in the face just prior to their first meeting, yet remember the details of advising him of a mandatory life sentence. Having said that, the court notes that Mr. Martucci did in fact testify that he advised Kratsas that he faced a mandatory life sentence if convicted after a trial. E.H. I p. 60–61.

More persuasive however, was Mr. Rubin' s testimony which was corroborated, in part, by Mr. Miller. Mr. Rubin unequivocally testified that he advised

---

**3.** For ease of reference, "E.H. I" refers to the transcript of the evidentiary hearing held on October 12, 1999, and "E.H. II" refers to the second part of the hearing held on October 27, 1999.

Kratsas of a mandatory life sentence, that he reviewed the statute that permits such a mandatory sentence, and that he advised petitioner that he was likely to be convicted if he went to trial. E.H. I p. 20–21. The court finds Mr. Rubin to be credible. He testified about several aspects of his representation of petitioner, and candidly admitted his shortcomings [4] in that representation, which, in the court's view lends to his credibility.

Petitioner maintains that the sentencing hearing indicates that Mr. Rubin was not aware of the mandatory life sentence required by 21 U.S.C. § 841(b)(1)(A). Kratsas points out that the sentencing guidelines were inapplicable in his case once he was convicted, because the statute mandated life. Therefore, he argues, it was superfluous for Mr. Rubin to argue guideline issues at sentencing. Petitioner goes on to say that the fact that counsel argued guideline issues, namely an adjustment for obstruction of justice pursuant to USSG § 3C1.1, indicates that he was unaware that the statute mandated life.

At first blush, this argument appears to raise some question about Mr. Rubin's understanding of Kratsas's exposure to a mandatory life sentence; however, when the sentencing transcript is read in its entirety, the argument falls apart. The record clearly indicates that Mr. Rubin argued against the guideline adjustment because the government requested that the court impose both a statutory sentence and a guideline sentence in the event that the statutory sentence was infirm. The following colloquy took place during sentencing:

> The Court: So you're talking about the guidelines, and you're saying as far as this situation's concerned, whatever the guidelines sentence, it's been su-

perseded by the statutory requirement?

> Ms. Skalla: Yes, sir.

> The Court: If that's the case, what difference does it make to you whether or not an obstruction of justice is—

> Ms. Skalla: Your Honor, under the statute, it really doesn't make a difference, under the statutory requirement of a life sentence.

> The Court: That's what I am saying.

> Ms. Skalla: It does not make a difference. However, as the government indicated in its sentencing memorandum, we're requesting that the Court also make an alternative finding in case on appeal there's some defect noted in the way that the life sentence was given.

App. II p. 587.[5]

Mr. Miller also testified about the issue of mandatory life, saying that he discussed the mandatory life sentence with both counsel on several occasions, and that he met with Kratsas on a few different occasions. E.H. I p. 94–95. However, he did state that he had no independent recollection of whether or not Kratsas was at the meetings in which he discussed the mandatory sentence with his lawyers. E.H. I p. 94.

Finally, petitioner took the stand on his own behalf and testified that he was never advised of the mandatory life sentence, instead, he stated, that it was his understanding that he *might* receive a sentence of life if convicted, but that the sentencing judge would have discretion in determining exactly what his sentence would be. E.H. I p. 125–126. Further, he testified that he knew the plea agreement was for approximately twenty years and was contingent upon his cooperation with the government;

---

4. For example, when testifying about whether he attempted to persuade the government to reinstate the plea offer during trial, after Kratsas noted that the weight of the evidence was against him, Mr. Rubin stated, "I have to tell you, I don't have an independent recollec-

tion of reopening those negotiations and if I didn't, I should have." E.H. I p. 41.

5. "App. I" refers to Appendix I filed by defense counsel in conjunction with this motion, and "App. II" refers to Appendix II.

however, he was under the impression that he would be facing thirty or forty years, or possibly even life in prison if convicted after a trial. E.H. I p. 122–123.

Clearly, the petitioner has a strong motivation to be untruthful in his testimony, he is, after all, serving a life sentence without the possibility of parole. However, in spite of the obvious incentive to color his testimony, the court found him to be rather credible. Most notably, petitioner did not overstate his case. For example, the plea agreement that Kratsas signed but later aborted, indicated that the maximum punishment was life imprisonment, rather than mandatory life. *See* n. 1 supra. Kratsas testified that he was told he faced life in prison, but not that it was mandatory; thus, it would have been beneficial for him to testify that he had seen the language in the plea agreement, and that such language contributed to his perception of the potential sentence. However, when questioned about the language in the offer, he frankly stated that he had not been aware of that language. E.H. I p. 123.

Additionally, the following colloquy took place on cross-examination:

A. Do you remember that day that Mr. Miller came to talk to you?

A. Yes.

Q. What did you talk about?

A. He just says, you know, if I don't take this 20, I could be facing life.

Q. You could be facing mandatory life?

A. I don't know if that was his exact words. But I do know him saying life.

Q. You don't remember him saying mandatory life?

A. I don't really remember the whole thing. But I do remember the words life coming out of his mouth. I do remember.

E.H. I p. 149. Again, the petitioner's demeanor and answers suggest that he was being truthful to the court. He did not deny that he was told of the possibility of a life sentence, nor did he testify that he had a vivid recollection of the events in question; both of these factors indicate truthfulness. However, the court nonetheless finds that Kratsas has not established that his counsel was deficient in their performance.

First, the court credits Mr. Rubin's testimony and finds that he properly advised petitioner of the mandatory sentence. Therefore, even if Mr. Martucci did not adequately advise petitioner about his sentence, no prejudice resulted because any possible harm was cured by Mr. Rubin's advice. Further, the court finds that although Mr. Rubin properly advised petitioner, petitioner did not understand the distinction between life and mandatory life. However, there is no duty for an attorney to insure that his client understands all that he is told. *See Jones v. Murray*, 947 F.2d 1106 (4th Cir.1991). Indeed, such a standard would present obvious difficulties, not the least of which is that counsel has no way to measure what someone does or does not understand. Thus, in *Jones*, the Fourth Circuit noted that professional norms surrounding plea negotiations require the following: 1) notifying the client of the plea offer; 2) advising the client of the option to proceed to trial; 3) presenting the client with the probable outcomes of both the guilt and sentencing phases of each alternative; and 4) permitting the client to make the ultimate decision. *See Id.* at 1110–1111.

The record supports a finding that Mr. Rubin complied with all of the aforementioned requirements; thus, the court will not hold counsel accountable for defendant's lack of understanding. There is nothing in *Jones*, or any other case cited by the petitioner, to suggest that a client, who was properly advised but misunderstood such advice, received ineffective assistance of counsel. Certainly, if counsel's advice had been flawed, the result would be quite different. *See United States v. Gordon*, 156 F.3d 376 (2nd Cir.1998) (erroneous advice concerning sentence exposure amounts to ineffective assistance); *United*

*States v. Day,* 969 F.2d 39 (3rd Cir.1992) ("if Day is correct that he was seriously misled about his sentence exposure when the likelihood of his conviction was overwhelming, he received ineffective assistance."); and *Turner v. State of Tennessee,* 858 F.2d 1201 (6th Cir.1988) (counsel's advice to reject two year plea offer was ineffective when defendant ultimately received a life sentence), *vacated on other grounds,* 492 U.S. 902, 109 S.Ct. 3208, 106 L.Ed.2d 559 (1989), *reinstated,* 726 F.Supp. 1113 (1989), *aff'd,* 940 F.2d 1000 (1991). However, absent a showing of deficient performance, petitioner's claim of ineffective assistance cannot survive.

**IV. *Conflict of Interest***

Next, petitioner alleges that he received ineffective assistance at trial due to a pre-existing conflict of interest between his attorney, Mr. Rubin, and the government's witness, George Bonnett. As discussed above, prior to trial Judge Harvey held a hearing to determine whether a conflict did in fact exist between Mr. Rubin and George Bonnet, and found that no such conflict was present. Despite that finding and petitioner's pre-trial waiver of any conflict, petitioner alleges that Mr. Rubin labored under an actual conflict of interest which prevented him from adequately cross-examining George Bonnett. He further argues that Judge Harvey erred in accepting his waiver of his Sixth Amendment right to a conflict-free attorney. In the alternative, Kratsas argues that even if Judge Harvey properly accepted the pre-trial waiver, the trial court clearly erred in failing to recognize that Mr. Rubin was operating under an actual conflict.

"In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Yet, unlike other claims of ineffective assistance, a conflict of interest claim does not require a showing of prejudice, for once the petitioner demonstrates that an actual conflict existed and that such conflict adversely affected counsel's performance, prejudice is presumed. *See Id.* at 349–50, 100 S.Ct. 1708 and *United States v. Tatum,* 943 F.2d 370 (4th Cir.1991). However, a defendant is entitled to waive his right to conflict-free counsel so long as such waiver is knowing and voluntary. *See United States v. Brown,* 202 F.3d 691, 697–98 (4th Cir.2000).

In *Brown* there was no dispute that defendant's attorney labored under an actual conflict of interest, the only question for the Fourth Circuit was whether the defendant had made a knowing and voluntary waiver of such conflict. *See Id.* at 696. In its opinion, the Fourth Circuit advised:

> When a lawyer is operating under a conflict of interest as serious as the one here, that lawyer, the Government, and the district court should provide the defendant with as much relevant information as possible about the conflict before the court accepts a waiver of the conflict of interest. However, if a defendant waives the conflict with knowledge of the crux of the conflict and an understanding of its implications, the waiver is valid—even if the defendant does not know each detail concerning the conflict. Thus, even if we were to agree that Brown did not know all the facts relating to the conflict, the record establishes that he clearly knew enough to make a knowing, intelligent, and voluntary waiver.

*Id.* at 697–98.

Against this background, the court finds that Kratsas did indeed make a knowing and voluntary waiver of any potential conflict between Mr. Rubin and George Bonnett. The record of the hearing on this matter indicates that Kratsas was fully advised of the potential conflict and chose to be represented by Mr. Rubin nonetheless. The following is a portion of the

colloquy between Judge Harvey and Kratsas:

> The Court: As Mr. Rubin may have told you, the government has filed a motion seeking to remove Mr. Rubin because at one time, he represented George Bonnett. Mr. Bonnett is scheduled to testify in the trial of your case before a jury, and Mr. Rubin may be cross-examining Mr. Bonnett on your behalf. Do you understand all of that?
>
> The Defendant: Yes, sir.
>
> The Court: The question that arises here is whether there is a conflict, because as you may also know, Mr. Rubin at one time, in the case of *United States v. Ramirez*, in which Mr. Bonnett was named as a defendant, represented Mr. Bonnett in some preliminary proceedings. Are you aware of that?
>
> The Defendant: Yes, sir.
>
> \*     \*     \*     \*     \*     \*
>
> The Court: Are you willing to give up any rights you might have because you want Mr. Rubin to represent you at the trial of this case?
>
> The Defendant: Yes, sir.
>
> The Court: Is that decision made by you voluntarily and with full understanding of your rights in this regard?
>
> The Defendant: Yes, it is.
>
> \*     \*     \*     \*     \*     \*
>
> The Court: Later on in this case, we don't want to have something come up and you say, well, you represented Bonnett, so I don't want you to represent me. When the case goes to trial, Mr. Bonnett is going to testify and Mr. Rubin is going to cross-examine him, and Mr. Rubin formerly represented Mr. Bonnett for a short period of time in 1991. Do you understand all of that?
>
> The Defendant: Yes, Your Honor.

App. I p. 174–176. Ironically, Kratsas is now attempting to do exactly what Judge Harvey advised him he would not be permitted to do, that is, waive the conflict only to raise it at some later date. This court will not permit him to do that, and finds that he was fully advised of the conflict and made a knowing and voluntary waiver of his right to have conflict-free counsel.

■ Next, Kratsas argues that even if his waiver was knowing and voluntary, Judge Harvey erred in accepting it. He claims that not every conflict can be waived, and since Mr. Rubin labored under an actual conflict, Judge Harvey should not have accepted petitioner's waiver. In support of his argument, petitioner cites *Hoffman v. Leeke*, 903 F.2d 280 (4th Cir. 1990) in which the Court noted that "the Sixth Amendment right to counsel is not inviolable," and, "Not even the proffer of admittedly valid waivers of conflict-free counsel can restrict a trial court's power to insist on separate representation." *Id.* at 288. Indeed, petitioner is correct, a trial court need not accept a defendant's waiver regardless of whether it is an *actual* conflict or only a serious *potential* conflict. *See Wheat v. United States*, 486 U.S. 153, 161–65, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). However, what petitioner fails to note is that the case law recognizes the fine line that trial judges must tread:

> If a district court agrees to the multiple representation, and the advocacy of counsel is thereafter impaired as a result, the defendant may well claim that he did not receive effective assistance. On the other hand, a district court's refusal to accede to the multiple representation may result in a challenge such as petitioner's in this case [that he was denied counsel of his choice].

*Id.* at 161, 108 S.Ct. 1692 (citations omitted). In fact, the Supreme Court held that the district court properly refused to accept Wheat's waiver of the conflict of interest but stated:

> Other district courts might have reached differing or opposite conclusions with equal justification, but that does not mean that one conclusion was "right"

and the other "wrong".... The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court.

*Id.* at 164, 108 S.Ct. 1692.

With this in mind, the court finds that Judge Harvey did not err in accepting Kratsas's waiver. The record clearly demonstrates that Judge Harvey was fully aware of the potential conflict and found that no "actual" or "serious potential conflict" existed. As Judge Harvey mentioned in ruling on the government's motion, the presumption is in favor of defendant's counsel of choice; and, after fully assessing Mr. Rubin's prior representation of George Bonnett, Judge Harvey determined that such presumption had not been overcome by a showing of either an actual conflict or a serious potential conflict. App. I p. 187–189. This court finds that Judge Harvey did not err in his acceptance of petitioner's waiver, and further finds that no actual conflict existed either pre-trial or during trial.

Petitioner's argument regarding the matter is flawed. During Bonnett's testimony at trial, the government sought to question him about Mr. Rubin's representation. The government wanted to ask Bonnett the source of Mr. Rubin's fee, expecting that he would testify that Kratsas had paid Mr. Rubin's fee while Mr. Rubin was representing Bonnett. The government's objective was to demonstrate the relationship between Kratsas and Bonnett, the star government witness. When this line of questioning began, defense counsel objected and there was a conference at the bench in which Ms. Skalla, AUSA, argued that she would not use Mr. Rubin's name but merely wanted to ask Bonnett who had paid for his attorney. Mr. Rubin, noting that any connection between Bonnett and Kratsas would prove detrimental to his client, vigorously argued that Ms. Skalla should not be allowed to ask any questions about the representation because his records indicated that he was paid, not by Kratsas, but by Bonnett's girlfriend. However, in an attempt to be candid with the court, Mr. Rubin added, that if Bonnett's girlfriend were asked where she received the money to pay Mr. Rubin, she might very well say that it came from Kratsas.

This court, the trial court, ruled that the government could not ask any questions about Mr. Rubin's representation or the source of the fee, a ruling that clearly benefitted the defendant, for it made it more difficult for the government to establish a relationship between Kratsas and Bonnett. However, the defendant now argues that had the court allowed the questioning, Bonnett would most likely have lied about the source of the money, saying that it came from Kratsas, in which case Mr. Rubin could have impeached him on cross-examination. This argument is so attenuated it is even difficult to articulate. Suffice it to say, that this does not amount to a serious potential conflict of interest, much less an actual one; thus, petitioner's claim is denied.

## V. *Underlying Convictions*

Lastly, petitioner claims that Mr. Rubin was ineffective for failing to challenge the validity of two of his underlying convictions, convictions which formed the basis of his life sentence.

Pursuant to 21 U.S.C. § 851, a petitioner may challenge the validity of underlying convictions that are used to enhance his punishment; however, in the present case, counsel did not raise any objections to either conviction. When asked at sentencing whether he intended to challenge the previous convictions, Mr. Rubin answered:

It's hard for me to challenge one of the cases, Your Honor, because I was counsel of record. On the other case, I am aware of that conviction, there is no challenge pursuant to what you just read [21 U.S.C. § 851].... I can't in good

conscience challenge that, although I would like to.

App. II p. 565.

Petitioner argues that an attorney's failure to challenge a prior conviction that is used to enhance a defendant's sentence constitutes ineffective assistance if such a challenge were likely to be effective. In support of this proposition, petitioner cites *United States v. Kissick,* 69 F.3d 1048, 1053–56 (10th Cir.1995), in which the Tenth Circuit held that "[a]n attorney's failure to challenge the use of a prior conviction to classify the defendant as a career offender when that prior conviction is facially insufficient to satisfy the [guideline] definition ... constitutes deficient performance under *Strickland." Id.* at 1056. Kratsas also cites the Fourth Circuit case of *United States v. Breckenridge,* 93 F.3d 132, in which the Court found that counsel was deficient for failing to argue at sentencing that the defendant's prior convictions were "related," in that they were consolidated for trial, and therefore, should not be considered separately for purposes of the career offender provision. *See Id.*

▮ Although none of the cases cited by petitioner deal directly with 21 U.S.C. § 851, the court agrees that an attorney's deficient performance at sentencing, if such performance proved prejudicial to the defendant, would constitute ineffective assistance. *See United States v. Burkley,* 511 F.2d 47, 51 (4th Cir.1975) (sentencing is a critical stage of a criminal prosecution to which a defendant has a right to effective assistance of counsel). However, in the instant matter, petitioner has failed to demonstrate that his attorney was deficient in failing to challenge either of the two convictions in question.

▮ First, petitioner contends that Mr. Rubin was deficient in failing to challenge

his 1990 state conviction for possession of a firearm and conspiracy to possess with intent to distribute narcotics. In that case, Kratsas, along with two other individuals, was represented by Mr. Rubin. Kratsas alleges that he was denied ineffective assistance in this underlying case because Mr. Rubin labored under an actual conflict of interest which led him to negotiate a "wired" [6] plea agreement for the three defendants. Further, Kratsas argues that he was prejudiced by this wired plea, in that he received the most severe sentence out of the group. He alleges that due to Mr. Rubin's conflict, Mr. Rubin was unable to "vigorously negotiate on behalf of any one client."

The court disbelieves petitioner's assertion that the 1990 plea was a wired agreement, and further finds that Mr. Rubin's representation of multiple defendants did not impair his ability to negotiate on behalf of each defendant individually. Kratsas himself testified that Mr. Rubin negotiated a deal with the state prosecutor that included probation for one of Kratsas's codefendants, but some prison time for Kratsas. In response to this offer Kratsas said:

> I told him I wasn't taking no time for this, you know, because I knew that there was no evidence against me, you know, and I said I ain't taking no time and then he went back in and come back out with probation for me as well.

E.H. I p. 106. This testimony in itself indicates that Mr. Rubin negotiated on behalf of each defendant. A further indication that the plea agreement was not wired was that one of the defendants, Michael Williams, had his case severed and his charges were ultimately dismissed. Despite this fact, Williams testified on behalf of Kratsas at the evidentiary hearing, saying that he was coerced into accepting the plea and stated that he specifically remembers that the plea offer was an "all-

**6.** By "wired," the petitioner means that either all of the defendants had to accept the agreement or none of them could accept it. Petitioner alleges that if any one of the three

defendants declined to plead guilty, the state would have rescinded the plea offer as to the remaining defendants.

or-nothing" plea. The court found Williams to be totally incredible. Initially, the court disbelieves that Williams was "coerced" into accepting a plea that resulted in the *dismissal* of his charges. Moreover, it is rather suspect that Williams has a vivid memory of the facts surrounding this plea agreement; yet, on cross-examination, was unable to remember any of the facts, attorneys' names, or charges associated with any of the dozen other plea agreements he has entered.

Finally, Mr. May, the Assistant State's Attorney who negotiated the plea with Mr. Rubin, testified that although he had no independent recollection of the facts of this case, his recollection was that he never entered into wired pleas at any time while working in the State's Attorney's Office. In fact, he said he had never even heard of such a plea until he spoke with the Assistant United States Attorney in this matter.

Given this background, the court finds that Mr. Rubin was not laboring under an actual conflict of interest when representing Kratsas in 1990, indeed, all of the individuals testifying regarding this matter agreed that the results obtained in the 1990 case were excellent results. Thus, Mr. Rubin was not deficient in failing to challenge this conviction at the federal sentencing.

Next, Kratsas argues that Mr. Rubin was ineffective for failing to contest the validity of his 1988 conviction. This conviction was based on a not guilty agreed statement of facts, which, petitioner argues, is the functional equivalent of a guilty plea, and therefore requires that the defendant knowingly and voluntarily waive his constitutional rights. Further, Kratsas maintains that he did not properly waive his constitutional rights because he was not adequately informed of the charges pending against him or his right against self-incrimination at a trial.

Petitioner is correct in his assertion that when a defendant elects to plead not guilty based upon an agreed statement of facts the court must make an inquiry on the record which assures that the defendant's waiver of his constitutional rights is voluntary and knowing. *See e.g., Yanes v. State,* 52 Md.App. 150, 154–55, 448 A.2d 359 (1982); *Sutton v. State,* 289 Md. 359, 364–68, 424 A.2d 755 (1981). However, the court finds that the state judge's colloquy, prior to accepting the not guilty plea, was sufficient. Judge Lerner of the Circuit Court for Anne Arundel County fully advised Kratsas of his right to a jury trial as well as the maximum penalty for the offense charged. He further informed him that there was a "99.999 percent" chance that he would be convicted if he proceeded under a not guilty statement of facts. Finally, when Kratsas was asked, "Is there anything about these proceedings that you don't understand?" he answered, "No." In addition to this record, Mr. Rubin, in a sworn affidavit, stated that he spoke with Mr. Ripple, Kratsas's attorney for the 1988 conviction, and Mr. Ripple informed Mr. Rubin that there was nothing infirm about the 1988 proceeding. Given all of these circumstances, the court finds that it was reasonable for Mr. Rubin not to raise this issue at sentencing. In sum, petitioner had failed to establish that his attorney rendered ineffective assistance.

For all of the foregoing reasons, the petition to vacate, set aside, or correct sentence is denied.