IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 01-60397

---

UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

                    versus

CLIFFORD D. NEWELL; KIM GIANAKOS,

                              Defendants-Appellants.

---

Appeals from the United States District Court
For the Southern District of Mississippi

---

December 19, 2002

Before KING, Chief Judge, JOLLY, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

     Clifford Newell, Kim Gianakos, Darrell Wayne Raley, and Kary Graham were charged in a superceding indictment with mail and wire fraud.  In addition, Gianakos was charged with conspiracy to launder money, Newell and Raley were charged with separate money laundering and conspiracy to commit money laundering offenses, and Newell was also charged with federal tax evasion for the years 1994 through 1996.  Raley and Graham were acquitted of all charges, Newell was found guilty on all charges, and Gianakos was convicted of one count of mail fraud.

Newell urges that his attorney, who also represented Raley, manifested an actual conflict of interest during the course of the trial that impaired Newell's defense. We conclude that although the district court before trial diligently complied with Rule 44(c) of the Federal Rules of Criminal Procedure by warning Newell that conflicts of interest might arise from sharing counsel with Raley, it failed to take action when an actual conflict became clear at trial.[1] We therefore REVERSE Newell's judgment of conviction and REMAND for a new trial.[2]

Gianakos argues that the district court erred in overruling her objections to two pieces of evidence, as well as to portions of the prosecutor's closing argument and to the jury instructions. Finding no reversible error, we AFFIRM her conviction.

**I**

The scheme charged involved Comcast Corporation, a cable television provider in Mississippi, and the use of an American Express credit card. At trial the government maintained that

---

[1] FED. R. CRIM. P. 44(c) ("Whenever two or more defendants have been jointly charged ... or have been joined for trial ... and are represented by the same retained or assigned counsel ..., the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.").

[2] Newell also attacked his sentence on several bases. Because we find his conviction infirm, we need not address these contentions.

-2-

Gianakos falsely billed Comcast for services purportedly performed by her advertising agency, Gianakos Associates ("GA"). Primestar, the name under which Comcast offered satellite television services, was GA's largest client. According to the government, David Van Colvin, Primestar's general manager and the son of a Comcast executive, had Gianakos pay his American Express ("AmEx") bill. Gianakos would, in turn, bill the payment to Comcast as a marketing expense, with a markup that ranged from ten to thirty-three percent. Although Gianakos argued at trial that she accepted Colvin's representations that the AmEx charges were for legitimate marketing expenses, Colvin used the AmEx card for various personal expenses and never submitted the statements to Gianakos so that she could confirm the nature of the charges. Between 1994 and 1996, Gianakos billed Comcast for almost $2.5 million; on these billings, she was paid over $350,000 in markups.

Newell was a vice president of Trustmark National Bank in Meridian and Colvin's close friend. When Colvin wanted to build a home next to Newell's, Newell helped Colvin buy the lot and introduced him to Raley, a home builder. He also arranged for Trustmark to make the construction loan. As the construction loan was depleted, Colvin began using his AmEx card to pay to complete the home. The government urged at trial that Newell became a willing participant in Colvin's fraudulent AmEx billing scheme, using the AmEx card for Newell's own personal expenses.

There was evidence at trial that after Raley finished building

Colvin's house, Newell suggested that Raley become an AmEx vendor. Raley applied for an AmEx vendor account under the name "Raley Builders." The account was set up so charges could run through Colvin's AmEx card. When Raley received his card imprinter, he gave it to Newell, who kept it in his office at the bank. Newell would imprint Colvin's AmEx card and bill AmEx large amounts of money for the charges. At times, Raley went to Newell's office to sign for the amounts submitted to AmEx, and at other times he allowed Newell to sign his name. There was evidence at trial that Newell used the card both to get money for projects in which he and Colvin were involved, and for his own personal expenses. From November 1994 until July 1996, AmEx paid Raley Builders over $1.1 million for charges on Colvin's AmEx card.[3]

## II

At trial, Newell and Raley were represented by the same attorney, Henry Palmer.[4] Raley was acquitted and Newell was convicted. Although the judge questioned Newell before trial about potential conflicts of interest and Newell elected to proceed, he argues that he did not waive his right to conflict-free counsel.

---

[3] The government also attempted to prove that Newell laundered some of the AmEx funds in several ways, including his asking an attorney friend, Charles Smith, to run some transactions through Smith's trust account "for record purposes." The government further contended that Newell committed tax fraud by failing to report the funds he received through the AmEx transactions.

[4] Additionally, co-defendant Graham, who was also tried in the same proceeding, was represented by Palmer's law partner.

-4-

Alternatively, he contends that the actual conflict and its dimensions did not surface until trial and were in any event so egregious as to be at the least beyond the scope of any waiver resulting from the court's inquiry before trial, if waivable at all.

"The [S]ixth [A]mendment right to effective assistance of counsel derives from the defendant's fundamental right to a fair trial, a goal best achieved by ensuring that the process involves vigorous partisan advocacy by both sides."[5]  Thus, "[t]he right to the effective assistance of counsel is ... the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing."[6]  When a defendant has been able to show that his counsel "'actively [represented] conflicting interests and that [an] actual conflict of interest adversely affected his lawyer's performance,' constitutional error has occurred, and prejudice is inherent in the conflict."[7]  A lawyer places himself in an impossible situation when the defense of one client is perforce to the detriment of another client.[8]

In cases where a defendant demonstrates such a conflict of

_____

[5] *Haynes v. Cain*, 272 F.3d 757, 761 (5th Cir. 2001).

[6] *United States v. Cronic*, 466 U.S. 648, 656 (1984).

[7] *Hoffman v. Leeke*, 903 F.2d 280, 286 (4th Cir. 1990) (quoting *Strickland v. Washington*, 466 U.S. 668, 692 (1984) (some internal quotation marks omitted)).

[8] *See Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980).

interest, we ask whether the defendant freely and validly waived his right to representation by a conflict-free attorney.[9] Applying *Cuyler*, we do not ask whether the actual conflict prejudiced the appellant's defense.[10] Prejudice is presumed upon a showing of an actual conflict, not waived by the defendant.[11]

In *Beets v. Scott*, we explained that "[n]ot all conflicts of interest that affect the attorney's 'duty of loyalty' have the same consequences, and they are not all suited to *Cuyler*'s stringent rule."[12] Rather, "*Strickland* more appropriately gauges an attorney's conflict of interest that springs not from multiple client representation but from a conflict between the attorney's personal interest and that of his client."[13] The reason for the distinction was as clear then as it is today:

> When multiple representation exists, the source and consequences of the ethical problem are straightforward: "counsel represents two clients with competing interests and is torn between two duties. Counsel can properly turn in no direction. He must fail one or do nothing and fail both["] .... Conflicts between a lawyer's self-interest and his duty of loyalty to the client, however, fall along a wide spectrum of ethical sensitivity from

---

[9] *United States v. Rico*, 51 F.3d 495, 508 (5th Cir. 1995).

[10] *Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir. 1995) (en banc).

[11] *Id.*

[12] *Id.* at 1269.

[13] *Id.* at 1260.

merely potential danger to outright criminal misdeeds.[14]
Thus, the standard we employ here is confined to claims such as
Newell's that challenge an attorney's divided loyalties due to
multiple representation, a conflict which in the most literal sense
demonstrates a denial of the "right to have the effective
assistance of counsel."[15]    *Strickland*'s two-pronged analysis,
including its requirement of a showing of prejudice, governs all
other attorney-client conflicts, their range being "virtually
limitless."[16]

**A**

That there was an actual conflict of interest in Palmer's
representation of both Newell and Raley is plain.  Start to finish,
Palmer presented at trial a lop-sided defense strategy centering on
Raley's simple-minded trust of Newell and Newell's confederacy with
Colvin, the undisputed mastermind of the illegal operation.  In his
opening statement, Palmer first asserted that "[w]hat happened here
... is not a crime unless there's guilty knowledge on [the
defendants' parts] that David Colvin is a thief."   He then
proceeded to explain,

David Colvin said that he didn't know if Wayne [Raley]

---

[14] *Id.* at 1270 (quoting *Beets v. Collins*, 986 F.2d 1478, 1492
(1993) (Higginbotham, J., concurring)).

[15] *Id.* at 1266.

[16] *Id.* at 1271.

knew anything about the stealing scheme or not.... if that's what [Raley] knows, the government should apologize for indicting Wayne Raley. Wayne Raley treated David Colvin and this relationship as if it were a business. Bubba Newell, David Colvin's close friend, was the messenger. David, it was said, was eccentric, hard to deal with from a business standpoint. He was Bubba's neighbor, friend, godfather to his children and Bubba would do that. So Wayne's contact primarily was with Bubba through David.

.... Bubba Newell's relationship with David Colvin was entirely different [from Raley's]. [Colvin] had known [Newell] since the '80s .... He was a friend of the Newell family, a close friend ... David and Bubba [got] to know one another through [a third party] and became close friends, dearest friends.

[Colvin] spent Christmas Eve night in their home. He said that he would never marry again, would never have children and [Newell's children] were his....

Palmer then admitted that, in regard to Colvin, "Bubba made some – probably you may consider them errors in judgment," adding, "many times ... I think the Newells' judgment may have been clouded because of the fact that their children were involved."  Later on in the opening, Palmer asserted that Newell kept the AmEx card imprinter in his office because Newell was the "go-between" between Colvin and Raley, and reemphasized that "[t]here were an awful lot of gifts that the Newells got...."

In his cross-examination of Colvin, Palmer attempted to weave in his theme of Raley's distance from and Newell's closeness to Colvin:

Q.  And your relationship with Bubba Newell and the Newell family goes back a long time, and it's a friendly relationship as opposed to Wayne Raley, which was a business relationship, wasn't it?  Would that be fair to characterize it?

A.  I would have to say that I considered the Newells

very, very close friends and family, and Mr. Raley I would consider a good friend when I was dealing with him.

Q.    But you didn't spend Christmas Eve with Wayne Raley, did you?

A.    No, sir, that was with the Newells most likely.

Q.    Your relationship with Mr. Raley was purely him as a contractor and a man that paid your bills through this American Express vendor's arrangement, and that's all. You didn't have any –

A.    I had worked with him on a contractor relationship, yes, sir.

Consistent with this theory, after the government rested, Palmer moved for a directed verdict on Raley's behalf, explaining that the evidence suggested that Raley had no guilty knowledge unless it came "though Bubba Newell." Only after the court stated that it was denying the "motion of Mr. Newell and Mr. Raley" did Palmer add, apparently as an afterthought, "I had just made that on behalf of Mr. Raley, but I would also do – make one for Mr. Newell and adopt the arguments that have been made here."

Newell did not testify; Raley took the stand in his own defense. Palmer's direct examination of Raley largely consisted of Raley's pointing the finger at Newell. Upon prompting by Palmer, Raley testified that it was Newell who introduced Raley to Colvin; Newell who acted as the intermediary between Raley and Colvin; Newell who suggested that Raley become an AmEx vendor; and Newell who thought they should keep the AmEx card imprinter in his office. With Palmer's guidance, Raley portrayed himself as an innocent dupe who, upon Newell's request, continually gave Newell AmEx checks for

-9-

tens of thousands of dollars, which Newell usually claimed were for Colvin's expenses. With regard to one such check, Palmer's questioning of Raley proceeded as follows:

> Q. This last one, American Express check to Bubba, 25350?
>
> A. It was — $33,045 is what it was .... That was a check to — [Newell] said that David had given him permission to run — give a check to [Newell] to pay his bills....
>
> Q. This is when Mr. Newell was without a job?
>
> A. Right.
>
> Q. And what did you do with that check?
>
> A. I endorsed it and put on the back of it to pay to the order of C.D. Newell.
>
> Q. And did you have anything to do with it thereafter?
>
> A. I had nothing to do with it thereafter.
>
> Q. Now, this is an awful lot of money that's going to Mr. Newell, is it not?
>
> A. It is.
>
> Q. Did you — were you concerned or suspicious or problemed by that in any way?
>
> A. Well, all of it I didn't know was going to him.
>
> Q. Well, what [did you know] about it?
>
> A. What I knew about, no, it didn't. I just had a good friend, I thought. I didn't know — I didn't think nothing about it.

Palmer was placed in a particularly precarious situation during Raley's cross-examination, during which the government attempted to further implicate Newell. The government emphasized that Raley

-10-

made out several checks for Newell's benefit.  In one instance, the government pointed to "$89,553.13 on your account, that's checks that were cashed and money given to Bubba Newell, right?" which Raley confirmed.  Additionally, the government emphasized:

> Q. .... Now, you know that Bubba and David had a close relationship, don't you?
>
> A.   Yes, sir.
>
> Q.   And all the finances that you've testified about, every time you said David needed something paid, Bubba was in the loop there, wasn't he?
>
> A.   Right.
>
> Q.   Bubba was involved.  And we looked at some of these payments, some of them were actually – they may have been described to you, according to your testimony, as David's bills, but in reality they were Bubba's bills, weren't they?
>
> A.   It looked that way.

On redirect, Palmer implied that Newell had misled Raley about these expenses, asking, "Was it your understanding that those [checks] were [for] the benefit of David Colvin when you got them?" Raley replied, "[a]s from Mr. Newell, it was."

Palmer's strategy of sacrificing Newell to save Raley culminated in his closing argument, in which he spent forty-five minutes defending Raley, only realizing that he needed to mention a reason to acquit Newell after the court warned him that his time was coming to an end, to which he replied, "I'm going to have to hurry some now for Bubba."  In advocating Raley's innocence, Palmer actually admitted that even though the jury had a basis in the

-11-

evidence for finding all of the other defendants guilty – including

Newell – they could not convict Raley:

> The government can argue that Ms. Gianakos falsified an invoice. The government can argue that Cary Graham falsified an invoice. The government will argue that David Colvin told Bubba Newell about this scheme that he was in and Bubba was aware of it. But there's not one iota of evidence in the record that Wayne Raley did anything wrong during this entire procedure.

In attempting to minimize Raley's involvement in the scheme, Palmer several times stressed that Raley simply wrote the check and "gave it to Bubba," and "[w]hat happened after that Wayne didn't know"; he had "[n]o other involvement."

Palmer also used the closing argument as another opportunity to contrast the nature of Raley's relationship to Colvin with Newell's, reasserting that "Wayne's relationship with David was totally different from anyone else's. He wasn't a vendor for David. He wasn't a close personal friend like the Newells were. He didn't spend holidays with David.... It was with David as a business arrangement."

These excerpts reveal that, throughout the trial, Newell "was in the unacceptable position of having his own attorney help the state procure a witness against him."[17] This demonstration of partiality on the part of Palmer more than suffices to show that the defense of Raley was at the expense of the defense of Newell. The conflict at trial was palpable. We turn to the question of

---

[17] *Hoffman v. Leeke*, 903 F.2d 280, 286 (4th Cir. 1990).

waiver.

**B**

"Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences";[18] in other words, such a waiver must constitute an "intentional relinquishment or abandonment of a known right or privilege."[19]  In discerning whether Newell waived his right to conflict-free counsel, we must search the record for a basis upon which to conclude whether Newell had "actual knowledge of the existence of the right or privilege, full understanding of its meaning, and *clear comprehension of the consequence of the waiver.*"[20]

At the time of the Rule 44(c) hearing, the district court did not have sufficient information to inform Newell adequately of the full consequences of his waiver.  Although the trial court explained, in general terms, the possibility of conflict when an attorney represents two co-defendants, it did not describe the potential for conflict in Palmer's dual representation given the particular facts of the case.  Thus, although the district court's

---

[18] *Brady v. United States*, 397 U.S. 742, 748 (1970).

[19] *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

[20] *Hatfield v. Scott*, 306 F.3d 223, 230 (5th Cir. 2002) (emphasis added).

advice and inquiry served to warn Newell of the general dangers of dual representation, the scope of the waiver did not include the actual conflicts that arose during trial.

After twenty-seven years the requirements of *United States v. Garcia* are at the hand of every trial judge in the circuit.[21] It commands that the district court "address each defendant personally and forthrightly advise him of the potential dangers of representation by a counsel with a conflict of interest" and detail specifics about potential conflicts that are then foreseeable.[22] The trial court should then seek to elicit a response from each

---

[21] 517 F.2d 272, 278 (5th Cir. 1975).

[22] *Id.; see also United States v. White*, 706 F.2d 506, 508 (5th Cir. 1983). In *White*, we reversed a conviction based on our finding that an actual conflict had manifested itself during the trial of the defendant and that the district court had failed to at any time "inform the defendant of the precise manner" in which he was prejudiced by his attorney's representation. *Id.* at 508. In that case, White had requested that his attorneys be allowed to represent him against charges that he had escaped from federal custody. *Id.* at 507. The government asked for a hearing on its assertion that White's attorneys were operating under a conflict of interest in that they were suspected of participating in the defendant's escape. *Id.* During the hearing, the district court reviewed in general terms the perils of representation by an attorney with a conflict of interest and questioned the defendant regarding his wish to waive the conflict. *Id.* at 508 n.2. It also described the general nature of the conflict, explaining that "your lawyers are targets of an investigation into the matters surrounding your escape" and that it was therefore "possible that a conflict does exist between [the] interests of your lawyers and your interests." *Id.* Despite the district court's efforts in ensuring that White understood the nature of the conflict and was knowingly and voluntarily relinquishing his right to conflict-free counsel, we found the conflicts that emerged were beyond this waiver. *Id.* at 509-10.

-14-

defendant "that he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict."[23]  The difficulty is that *Garcia* is not a complete answer.  At the outset of a criminal case a district court can often offer little more than a general warning of possible harm.  Such an inquiry does not end the matter of conflicted counsel and the court remains under a continuing obligation during the course of trial to remedy an actual conflict if it emerges.

As we have observed, during Newell's conflict waiver hearing the trial court diligently attempted to comply with the procedure required in Rule 44(c) and *Garcia*.  The court advised the defendants in general terms of their Sixth Amendment right to conflict-free counsel, and told them that "there could be a potential conflict in that there could be a defense that is in the best interest of the two of you," and that Palmer "could be put in the position of choosing which of you to more effectively represent"; that if evidence existed "that would tend to exculpate one of you and not the other of you ... then there might be a tendency to be incriminated and  ... your attorney would be in the position of having to offer the evidence in order to defend your codefendant to your detriment."  The district judge explained during the colloquy that he did not know whether a conflict actually existed, but that it was conceivable.

---

[23] *Garcia*, 517 F.2d at 278.

-15-

These expressions by the court did not stand alone.  Prior to the hearing, the court denied a motion to sever filed by Raley and Newell.  The motion had requested severance in part on the basis that the defenses of the two men might conflict.  The court denied the motion, observing,

> Newell and Raley appear to complain that they will be prejudiced because Palmer will have the responsibility of representing two defendants at trial .... [T]here is no indication that Newell and Raley will employ defenses which are antagonistic to each other[; thus] the fact that they are represented by a single attorney is not sufficiently prejudicial to warrant severance.

In short, the trial court, necessarily unaware of Palmer's trial strategy or the details of the case, did not explain to Newell – or even contemplate itself – that Palmer's conflict could injure him by forcing Palmer to implicate Newell in order to save Raley.  We cannot conclude that Newell validly waived the actual conflict that surfaced at trial, since he "could not waive what he did not know."[24]

---

[24] *Hoffman v. Leeke*, 903 F.2d 280, 289 (4th Cir. 1990).  In *Hoffman*, the Fourth Circuit declared Hoffman's conflict waiver invalid because during the pretrial waiver hearing the trial court had not explained to Hoffman the potential conflicts engendered in Hoffman's sharing of counsel with his co-defendant, Moose, and had not secured a further waiver from Hoffman during trial when an actual conflict surfaced.  *Id.*  Before Hoffman's trial, Moose pleaded guilty to the charges and agreed to testify against Hoffman at trial.  *Id.*  Although the district court attempted to comply with Rule 44(c) by conducting a pretrial conflict waiver hearing, during the hearing the trial court did not inform Hoffman that Moose would testify against him at trial and that his attorney's joint representation of Moose and Hoffman might present special difficulties in combating Moose's testimony.  *Id.*  This was most likely because the trial judge may have been unaware of Moose's

As we explained, the trial judge remained under a duty to act when at trial what were unexpected possibilities became quite clear. At that juncture he was required to again inquire and either obtain a knowing waiver, disqualify counsel and mistry the case, or, if appropriate, grant the severance that was earlier denied and require separate counsel. That failure to act at trial is the error that compels this reversal, and it cannot be saved by the general advice and inquiry made at the outset and eroded by the court's skepticism expressed before the Rule 44(c) hearing that there was any conflict. As the Advisory Committee Notes to Rule 44(c) provide:

> [T]he mere fact that a rule 44(c) inquiry was conducted at the early stages of the case does not relieve the

---

plea bargain during the hearing. *Id.* However, the *Hoffman* court reasoned that the trial judge

> clearly became aware of the agreement[] at the start of the ... trial, and *at that point his obligation to insure a fair trial became apparent*. When it became obvious that [the attorney] had negotiated a plea bargain for Moose that required him to incriminate Hoffman, the judge had a duty to conduct further inquiry and secure a further waiver if Hoffman wished to make one. If Moose's agreement to testify against Hoffman did not come out during the court's acceptance of [Moose's plea], the judge became aware of it when the state called Moose to the witness stand. At that time, when the particular nature of the conflict came into sharp focus, further inquiry should have been made. Thus, even if Hoffman waived his right to conflict-free counsel at the [pretrial] hearing ..., he did not waive that right when he became aware that Moose was going to testify against him.

 *Id.* (emphasis added).

-17-

court of all responsibility in this regard thereafter. The obligation placed upon the court by rule 44(c) is a continuing one, and thus in a particular case further inquiry may be necessary on a later occasion because of new developments suggesting a potential conflict of interest.[25]

The difficulties posed by a conflict emerging at trial that was not sufficiently foreseeable as to be explained to a defendant before trial can be mitigated only by probing inquiry at the time the conflict surfaces or by great caution in allowing joint representation at the outset. The risk of unforeseen events must fall on one side or the other. And the principle that waiver requires an intentional relinquishment of known rights implicitly rejects placing that risk upon the defendant.

We do not suggest that a trial court cannot at the outset of any case obtain a waiver of the right to conflict-free counsel. Such a waiver obtained before trial will be valid against conflicts that emerge at trial in cases where they were sufficiently foreseeable that the judge can bring them home to the defendants in concrete terms. Nor is the trial judge powerless to prevent abusive use of common counsel such as an effort to force a severance or to control codefendants whose individual interest may

---

[25] FED. R. CRIM. P. 44 advisory committee's note; *see also United States v. Hall*, 200 F.3d 962 (6th Cir. 2000). In *Hall*, the Sixth Circuit reasoned that, "[e]ven though both Rex and Stanley Hall waived their rights to separate counsel" before trial, during trial an actual conflict surfaced "such that the trial judge should have intervened and at that stage severed the case against Stanley Hall." *Id.* at 963, 967.

be to cooperate with the prosecution.  We remind, in these circumstances the trial judge has the discretion in such circumstances to reject a proffered waiver.[26]

Given our finding that Palmer's representation of Newell and Raley was conflicted as measured by *Cuyler* – where to defend one was to prosecute the other – and that Newell's waiver before trial did not reach the conflict that was unforeseen and did not emerge until trial, we must reverse Newell's judgment of conviction and remand for a new trial.

## III

Kim Gianakos also appeals her conviction, arguing that the trial court erred in admitting certain pieces of evidence, allowing the prosecution to engage in certain arguments in its closing, and providing the jury with a deliberate ignorance instruction.  We analyze each in turn.

## A

Gianakos first argues that the district court abused its discretion in admitting the handwritten notes of Rebecca Cooper, Gianakos's in-house accountant.  The government called Cooper to the stand in its case-in-chief.  She testified to concerns she had about billing Comcast for Colvin's AmEx expenses without proper documentation.  Cooper explained that she confronted Gianakos about this on July 10, 1995.  Sometime thereafter, Cooper prepared a set

---

[26] *United States v. Wheat*, 486 U.S. 153, 163 (1988).

of notes that expressed her concerns and described what had prompted her to confront Gianakos. She did not remember when she had written the notes; only that they were prepared sometime following the July 10 meeting. The notes contained twelve points. The last two points read:

> (11) Kim [Gianakos] caused me confusion by telling me "I want to do things right, pay my taxes, etc." so I found it difficult to accept that perhaps things were not being "done right."
> (12) When I started hearing rumors that Kim was bragging about what she was doing with Comcast Satellite I expressed my concerns to Kim verbally 7/10/95[.]

The government introduced these notes into evidence during Cooper's testimony. Gianakos objected to them on the basis that they were hearsay, irrelevant, and prejudicial. The government responded that they were not hearsay because they fell under the state of mind exception, as "they go to [Cooper's] concern about this whole American Express billing process" and were "the best evidence of her concerns, the memorialization of her concerns." The trial court overruled her objection. Gianakos also expressed particular concern about the "rumors" comment and unsuccessfully requested that the comment in the notes be redacted.

Gianakos argues that the notes were offered to prove the truth of the matters asserted and do not satisfy Federal Rule of Evidence 803(3)'s exception for state of mind evidence, since the government did not prove that they were made contemporaneous with the July 10,

-20-

1995 meeting or that Cooper's state of mind was relevant.[27] Gianakos specifically attacks the "rumors" remark, which she requested be redacted from the notes, as highly prejudicial.

"The decision whether to admit testimony or other evidence is committed to the sound discretion of the trial judge."[28] Rule 803(3) allows an exception to the exclusion of hearsay evidence for "[a] statement of the declarant's then existing state of mind ... but not including a statement of memory or belief to prove the fact remembered or believed."[29] We find that the district court did not abuse its discretion in admitting the notes. The notes were admitted to prove Cooper's state of mind around the time she confronted Gianakos. Although Cooper could not identify the specific date on which she wrote the notes, she testified that she authored them when the events were still "fresh in her mind." Furthermore, although Gianakos urges that the notes bore no relevancy to the case, we are persuaded otherwise. Whether Cooper became concerned about the AmEx billing practices was relevant to whether Colvin's expenses were of such a suspicious nature that

---

[27] *United States v. Jackson*, 780 F.2d 1305, 1315 (7th Cir. 1986) (explaining that, to fall under the 803(3) state of mind exception, "(1) 'the statements must be contemporaneous with the ... event sought to be proven;' (2) 'it must be shown that the declarant had no chance to reflect – that is, no time to fabricate or to misrepresent his thoughts;' and (3) 'the statements must be shown to be relevant to an issue in the case.'").

[28] *United States v. Virgen-Moreno*, 265 F.3d 276, 295 (5th Cir. 2001) (internal quotation marks omitted).

[29] FED. R. EVID. 803(3).

-21-

Gianakos had to have known of their falsity.

Gianakos specifically objects to the district court's refusal to redact the "rumors" comment from the notes. The district court's denial of the motion to redact was premised on its conclusion that the rumors comment "provides the context for the inquiry that Ms. Cooper made of Ms. Gianakos." We find that the district court was within its discretion in denying the motion, as the rumors comment was a statement of memory or belief used to show why Cooper was confused and confronted Gianakos, and was not used to prove the truth of the rumors.

Although Gianakos urges that the district court should have provided a limiting instruction restricting the jury's consideration of the "rumors" comment to its purpose as a basis for Cooper's subsequent actions, Gianakos never requested such an instruction. In such instances, our review of the district court's failure to *sua sponte* provide a limiting instruction is restricted to plain error, and we consider only whether "the need for the instruction is obvious and the failure to give it so prejudicial as to affect substantial rights of the accused."[30] Substantial rights are affected only if the evidence for which the district court declined to provide a limiting instruction "had a 'substantial

---

[30] *United States v. Waldrip*, 981 F.2d 799, 805 (5th Cir. 1993) (internal quotation marks omitted).

impact' on the jury's verdict."[31]

The potential for prejudice occasioned by introduction of the rumors remark was lessened by the fact that the prosecution did not specifically highlight the rumors comment except to show that it was the basis for Cooper's confrontation of Gianakos.[32] Given the small part the notes, and especially the rumors comment, played in the prosecution's case against Gianakos, the remark could not have had a substantial impact on the jury's verdict.[33] Gianakos asserts that the central issue at trial was her state of mind and knowledge, and that the government honed in on that issue by calling attention to the rumors comment, which acted as the primary proof of her actual knowledge. However, direct evidence of Gianakos's knowledge of Colvin's defrauding of Comcast was not required to find that she was also guilty, as the government was proceeding under a deliberate ignorance theory. A wealth of

---

[31] *United States v. El-Zoubi*, 993 F.2d 442, 446 (5th Cir. 1993).

[32] The only point during the trial the prosecutor focused on the "rumors" statement was in a few brief questions during redirect examination of Cooper. During this exchange, the prosecutor asked Cooper whether she had heard the "rumors" that she had mentioned in her notes and further inquired, "And that's part of what you expressed to Ms. Gianakos sometime in July of '95?" Although Gianakos takes issue with the prosecutor's focus on the rumors remark during his closing, the prosecutor did not specifically mention the comment, other than in his reading of the entire text of the notes to the jury and in his statement, "when [Cooper] started hearing these rumors about what Kim was doing with the account, she expressed her concern. She got so upset that she started writing letters [of resignation] to Ms. Gianakos."

[33] *See id.*

-23-

evidence at trial supported that theory. Cooper affirmed that Gianakos continually billed Comcast for Colvin's AmEx expenses while falsely claiming they were for marketing tasks performed by GA. Gianakos also instructed Cooper to "arbitrarily" break up the large amounts Colvin submitted for payment into much smaller increments – never of the same size and always under $5,000 – so that Comcast would pay the amounts without asking questions. Gianakos also directed Cooper to randomly attach different labels to the broken-down amounts, such as "advertising and promotion," "direct mail," or "television," so that the amounts would appear to be for actual marketing tasks performed by GA. Gianakos admitted to Cooper that she "blithely" made up the amounts until she got "close to the end" and saw "how much I ha[d] left."

Additionally, although Gianakos claimed that Colvin always told her the expenses were for marketing tasks he performed, she never requested proof of the expenses even though, near the end of the operation, Colvin was submitting bills to GA for hundreds of thousands of dollars. Cooper testified that she became so concerned about these billing practices that she confronted Gianakos and threatened to resign. Even after the confrontation, during which Cooper urged Gianakos to talk to an attorney about the legality of the billing practices, Gianakos hesitated for some time before following Cooper's advice.

Given the prosecutor's limited use of the notes, particularly the rumors reference, and the substantial evidence on the record

signaling Gianakos's willing participation in Colvin's scheme to defraud Comcast, the trial court did not commit reversible error in admitting the notes, refusing to redact that rumors reference, and in not proffering a limiting instruction.

**B**

Gianakos also submits that the trial court erred in admitting a letter from Cooper to Cooper's attorney, Loeb, that disclosed the substance of certain communications between Gianakos and her counsel, Trapp. After the July 10, 1995 confrontation, Cooper consulted Loeb about the billing problems. Cooper finally persuaded Gianakos to seek the advice of an attorney on the matter, which Gianakos did by consulting Trapp in mid-August 1995. After meeting with Trapp, Gianakos held a meeting with senior associates at GA, including Cooper, in which she discussed her communications with Trapp and how the company would alter the billing procedure to avoid liability. After this meeting occurred, Cooper wrote a letter to Loeb explaining what Gianakos had told her. Cooper's letter to Loeb came into evidence over Gianakos's objection that it was hearsay and was protected by attorney-client privilege because it contained a summary of Trapp's communications to Gianakos. The court overruled Gianakos's objection by explaining that "the issue is Ms. Gianakos's good faith and this could have been regarded as bearing on that good faith defense."

The court apparently believed that Gianakos had waived the

privilege that attached to her communications with Trapp by asserting a good faith defense. However, review of the record makes clear that Gianakos's good faith defense was not based on advice of counsel, but rather on a simple lack of knowledge of the wrongdoing and absence of intent to participate in it. In *United States v. White*, the D.C. Circuit encountered a similar error, explaining:

> The district court apparently equated White's denial of criminal intent with a reliance-on-advice-of-counsel defense, which would have waived the privilege. Reliance on advice of counsel is an affirmative defense, an assertion more positive and specific than a general denial of criminal intent. To be acquitted for lack of criminal intent, White did not need to introduce any evidence of communications to and from [his attorney], and he did not do so.[34]

We similarly find merit in Gianakos's contention that she did not waive her attorney-client privilege by asserting good faith as a defense.

Defending the district court's decision, the government primarily relies on its theory that Gianakos waived the privilege by communicating Trapp's advice to Cooper. Gianakos denies that there was any waiver, urging that the two shared a common legal interest. The government replies that Cooper's and Gianakos's interests diverged, as Cooper had urged Gianakos to change their billing practices and Gianakos knew Cooper's concerns had led her to seek separate counsel and consider resigning.

---

[34] 887 F.2d 267, 270 (D.C. Cir. 1989).

"A party asserting a privilege exemption ... bears the burden of demonstrating its applicability."[35]   In a recent case, *In re Santa Fe International Corp.*, we clarified the law relating to the common legal interest rule.[36]   There we stated, "[a]ccording to our circuit precedents, the two types of communications protected under [this rule] are: (1) communications between co-defendants in actual litigation and their counsel; and (2) communications between *potential* co-defendants and their counsel."[37]   Communications between potential codefendants and their counsel are only protected if there is "a palpable threat of litigation at the time of the communication, rather than a mere awareness that one's questionable conduct might some day result in litigation."[38]   Thus, a cognizable common legal interest does not exist if a group of individuals seeks legal counsel to avoid conduct that might lead to litigation, but rather only if they request advice to "prepar[e] for future litigation."[39]

Here, Gianakos sought advice to protect herself and her employees from possible – not imminent – civil or criminal action.

---

[35] *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710 (5th Cir. 2001).

[36] *Id.*

[37] *Id.* (citations omitted).

[38] *Id.* at 711.

[39] *Id.* at 713.

Gianakos is not claiming that an investigation had commenced or that there was a threat of prosecution at the time she consulted Trapp. We see no common legal interest between herself, Cooper, and the other GA employees at the time Gianakos disclosed Trapp's advice to Cooper. It follows that Gianakos waived her personal privilege by communicating Trapp's advice to her employees.

Gianakos's better argument is that the letter was triple hearsay, a statement by Trapp to Gianakos included in a letter authored by Cooper. The government's assertion that the letter was not used to prove the truth of its contents is belied by the record. The portion of Cooper's letter with which Gianakos takes issue is the statement, "Mr. Trapp ... seems satisfied that [instituting a new billing procedure] removes Kim and Gianakos Associates from liability." In his closing, the prosecutor specifically highlighted that language in the letter:

> David Colvin testified ... [that Gianakos] changed her bills because she thought it might be mail fraud.... The defense wanted to keep you away from that notion of this being mail fraud, and so they used these kind of lawyer terms, these weasel words, if you will, about liability.
>     We know what kind of liability they're talking about. It is right here in this letter that Rebecca Cooper writes to Ronnie Loeb. She says, "We changed our billing process and we feel like this new method – this new method after August '95 removes us from liability." You understand what "removes" means. You can't remove somebody from liability if they didn't have liability to start with, can you? You can't pull her out of this mess, this fraud, this scheme if she wasn't in it to begin with.

This excerpt makes clear that the prosecutor used the letter to prove the truth of its statements. He did not use the letter to

-28-

prove that the new billing procedures removed Gianakos from liability, but he did utilize it to prove the truth of an inference to be taken from Trapp's purported statement that the new procedures would remove her from liability: that Gianakos was liable for a crime at the time she consulted with Trapp.

The letter was hearsay within hearsay, and the trial court abused its discretion in admitting the evidence. Again, we conclude there was no reversible error given that the government proceeded primarily on the theory that Gianakos remained deliberately ignorant of the fact that Colvin's AmEx expenses were not marketing-related, and substantial evidence supported its theory. Therefore, we conclude that the admission of this letter did not have a substantial impact on the jury's verdict.[40]

### C

Gianakos next complains that the district court abused its discretion in overruling her objection to the prosecutor's

---

[40] Gianakos also asserts that the trial court cut short the portion of her attorney's argument where he attempted to respond to the prosecutor's references to the Cooper letter. In his closing, Trapp tried to defuse the letter by explaining how Gianakos and Cooper "were trying to do the right thing." He continued by stating, "If a lawyer, the lawyer you're looking at, dropped the ball in this case, and there's no question the lawyer you're looking at ... miscalculated ...." At that point, the government objected. The court sustained the objection because "there's not any testimony or any reference about" Trapp's miscalculations on the record. Gianakos urges that the court should have overruled the objection, because Trapp was simply trying to explain the substance of the letter, but clearly the court was correct in sustaining this objection since Trapp was attempting to testify in his closing.

reference, in closing argument, to a purportedly well-known Mississippi felon, Lewis Nobles. Throughout the trial, Gianakos's counsel argued, and presented witnesses to attest to Gianakos's good character, including her participation in many charitable organizations. In his closing, the prosecutor attempted to rebut Gianakos's assertions of good character by referencing Lewis Nobles, a white collar criminal who, the prosecutor explained to the jury, stole over $3,000,000 from Mississippi College while at the same time establishing scholarships for needy students. The prosecutor stated that, like Nobles, Gianakos "wants you to remember all of the good things she was doing for the community while she was scheming with ... Colvin and stealing money from Comcast." The court overruled Gianakos's objection to the argument, explaining that it was a legitimate response to "the argument that good character ... is indicative that [the defendants] didn't commit the crime."

Gianakos argues that the court erred in overruling her objection to the Nobles references and for not providing a limiting instruction. She states that the prosecutor wrongly argued that the jury should discredit her good character evidence because a particular notorious person unrelated to the case at some time committed a crime. She urges that the argument also inflamed the jurors against Gianakos because of their likely disgust for Nobles. Gianakos also asserts that in labeling the argument "legitimate," the trial judge let the jury know that he believed the comparison

-30-

between Nobles and Gianakos was valid, which amounted to a signal to reject Gianakos' character evidence.

In determining whether prosecutorial argument is so inappropriate as to warrant reversal, we must weigh "(1) the magnitude of the prejudicial effect, (2) the efficacy of any cautionary instruction, and (3) the strength of the evidence supporting the defendant's guilt."[41] Analysis of these factors militates against a finding of error here. The magnitude of the prejudicial effect was minimal; in the context in which it was used, the argument only responded to Gianakos's character evidence argument and demonstrated, by example, that even a person of stellar character may stray into criminal conduct. Furthermore, in overruling Gianakos's objection, the court reminded the jury that "[t]he case is not about" Lewis Nobles, and also later told the jurors that attorney arguments were not evidence. Finally, the substantial evidence of Gianakos's guilt lessened the prejudicial effect of the challenged remarks. We are not persuaded that the remarks "cast serious doubt on the correctness of the jury verdict."[42]

---

[41] *United States v. Fletcher*, 121 F.3d 187, 196 (5th Cir. 1997).

[42] *Id.* (internal quotation marks omitted); *cf. United States v. Papajohn*, 212 F.3d 1112, 1121 (8th Cir. 2000) ("[W]e [cannot] say that the prosecutor's comparison of Ms. Papajohn's defense to the defense used in the O.J. Simpson case, although it might better have been left unexpressed, was inflammatory to a degree that would require a mistrial. Although courts have found that repeated comparisons between the defendant and figures such as Charles

**D**

Gianakos last argues that the evidence was insufficient to justify the district court's inclusion of a deliberate ignorance instruction in the jury charge. Gianakos timely objected to the instruction. We have explained,

> The deliberate ignorance instruction presents the danger that a jury will convict a defendant on the basis of the lesser *mens rea* of negligence – punishing the defendant

---

Manson, and Pontius Pilate and Judas Iscariot, may warrant relief on appeal, these cases are clearly distinguishable: The comments in our case were fleeting, did not draw a direct comparison between Ms. Papajohn and Mr. Simpson, and, whatever may be said about Mr. Simpson's public stature, surely did not involve a comparably notorious figure." (citations omitted)); *United States v. Frost*, 914 F.2d 756, 771 (6th Cir. 1990) (concluding that the prosecutor's references to Benedict Arnold and Judas Iscariot in closing argument were not reversible because the prosecutor "used Benedict Arnold and Judas Iscariot as examples of men with good characters who had 'gone bad' rather than as direct comparison models for defendants.").

Gianakos also complains that the prosecutor committed misconduct by uttering certain other statements in his closing. These included comparing David Colvin to the "teacher's pet" because his father was a Comcast executive and stating that Gianakos and the other defendants "rode his shirttails thinking the law would not apply"; arguing that Colvin having pleaded guilty to conspiracy was tantamount to him admitting that "I conspired with these people to steal money from my company. I did it. They did it with me. They helped me do it"; arguing that "as we alleged and as I believe we've proved, they are guilty"; asserting that "[t]his is not a woman who operates in the dark and I don't believe she operated in the dark in this case either," and "I don't know anybody in the real world who gets that kind of mark-up"; contending that during Gianakos's conversation with Colvin, in which she confronted him about the Comcast scheme, "I think what she probably said is 'I'm not going to lie for you anymore.'"

Gianakos objected to certain of these remarks and not others. Regardless of the standard to be applied, however, we conclude that none is so serious as to require reversal, especially in light of the district court's instruction that attorney arguments are not evidence.

for what he should have known. Circumstances rarely warrant the use of this instruction. Nevertheless, when the defendant claims he lacks the requisite guilty knowledge, such an instruction is appropriate if the trial evidence raises two inferences: "(1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct."[43]

We have further noted, "[t]he key aspect of deliberate ignorance is the *conscious* action of the defendant – the defendant *consciously* attempted to escape confirmation of conditions or events he strongly suspected to exist.... [D]eliberate ignorance is reflected in a criminal defendant's actions which suggest, in effect, 'Don't tell me, I don't want to know.'"[44]

Gianakos urges that the evidence did not support the instruction because she asked Colvin if the AmEx expenses were business expenses, and he lied to her. Gianakos explains that she eventually began to insist on purchase orders for the expenses, and required written verification of Colvin's authority, thereby showing she did not attempt to escape confirmation of Colvin's fraud.

The government asserts that the district court did not err in giving the instruction because ample evidence suggested that Gianakos agreed to pay Colvin's AmEx expenses and billed the amount

---

[43] *United States v. Gray*, 105 F.3d 956, 967 (5th Cir. 1997).

[44] *United States v. Lara-Velasquez*, 919 F.2d 946, 951 (5th Cir. 1990).

to Comcast as advertising-related expenses without ever once seeing the AmEx bills; she accepted without question Colvin's request to break up the amounts billed to avoid Comcast's corporate approval process; she instructed Cooper to prepare bills representing that her firm had provided a variety of advertising-related services that her firm never performed for Comcast, helping disguise her payment of Colvin's AmEx; and she persisted in these practices even though Cooper questioned her about them.

"When a challenge to jury instructions is properly preserved for appeal, we review the challenged instructions for abuse of discretion."[45] A deliberate ignorance instruction can be given "when a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference."[46] In deciding whether the evidence reasonably supports the jury charge, the court "reviews the evidence and all reasonable inferences that may be drawn therefrom in the light most favorable to the government."[47]

Viewing the evidence in the light most favorable to the government, it reveals both Gianakos's awareness of a high probability of Colvin's illegal conduct and her attempts to avoid learning of the conduct. Of particular importance is the fact that

[45] *United States v. Daniels*, 281 F.3d 168, 183 (5th Cir. 2002).

[46] *United States v. Wells*, 262 F.3d 455, 465 (5th Cir. 2001) (internal quotation marks omitted).

[47] *United States v. Wise*, 221 F.3d 140, 147 (5th Cir. 2000).

at no time did Gianakos request proof that Colvin's expenses were marketing-related and that Gianakos hesitated in seeking legal advice and changing the billing procedure after being confronted by Cooper. We have recognized before that whether a defendant "was questioned by her own employees about the legitimacy" of the situation is a factor in determining the propriety of the deliberate ignorance instruction.[48] Taken together, the evidence reveals that the district court did not abuse its discretion in including the instruction.

## III

In conclusion, we REVERSE Newell's conviction and REMAND for a new trial, and AFFIRM Gianakos's conviction.

---

[48] *Gray*, 105 F.3d at 967.